Good morning. May it please the court, my name is Stephen Barrick. I am the attorney for appellate J.D. Bols. I've informed the clerk, your honor, that I will be doing my opening argument for six minutes and have reserved four minutes for rebuttal. Counsel, please be reminded that the time shown on the clock is your total time remaining. I understand, your honor. Thank you. May it please the court, as I mentioned earlier, my name is Stephen Barrick. And as Chief Justice Roberts recently said in the Cedar Point nursery case, the protection of individual property is indispensable to the promotion of individual freedom. And your honors, that's what this case is about. And what this case is not about, this case is not about public health. I'm sure the courts have heard a lot of cases regarding these COVID moratoriums, but that is not what this case is about. And the reason why it's not about public health is because the moratorium and the reasons for and the stated state interest or local government interest in this case is not about public health, but rather, as the city mentioned in its own moratorium and its own language, is the city's desire to aid struggling businesses during hard times, which based on this press, that was anchored in the fact that of the pandemic, but for the pandemic, that circumstance would not have arisen. I would initially attend to agree with the court, your honor. But I think that if this court were to hold that this was about public health, or it sets a dangerous precedent, meaning the stated interest, and we have to take the government at its word, for the specific commercial moratorium, it was to aid struggling businesses. And the concern would be... That wasn't everything that was said. I understand, your honor. But what I would say that as it related, the moratorium involved residential and commercial properties. If looking at the articulated interests of the government as it related to the spread of COVID, it was directly primarily at the residential moratorium, meaning the government was concerned about the spread of the virus. It was concerned about the spread of individuals going into local homes and combining homes and therefore potentially spreading the virus. Wouldn't those same concerns be present for people going to work in commercial establishments? Your honor, I think in this case, those concerns could potentially be present, but there's no evidence shown by the government in this case, in the lower court or in its appellate briefs, that that was in fact a concern. As I mentioned earlier, the primary, we have to take the government at its word. And specifically as it related when discussing the commercial moratorium specifically, looking specifically at that moratorium, the focus was, and this is a portion of the record, are you referencing, counsel? The actual moratorium itself, your honor, which we attached, I believe, to our opening brief. Counsel, does this argument apply equally? You have really two claims, the contract clause and the takings clause. How does it impact our precedence on that, especially with respect to the contracts clause, as I understand it, correct me, as you were only seeking, you weren't seeking damages. So that's gone, that's moot now, isn't it, on the contracts? Are you relying mainly on the takings? We are, your honor, mainly on the takings. I think as the court is pointing out a recent decision of the Ninth Circuit dealing with the issue that there could be a potential mootness claim. Let's go to the takings clause there because it isn't what you have here, an economic effect. And for better or worse, the cases say a diminution of value, even a tremendous diminution of value, doesn't amount to a taking unless you meet the Penn Central factors. Your honor, if the court were to determine that this was a regulatory taking, the court would be bringing up, I think, extremely relevant points. I think based on our briefs, our issue, and we were really focused on two cases in particular, the Cedar Point Nursery case, which is a Ninth Circuit case. But there, they made you let people physically come in who otherwise would not have been able to. In your case, at least, you're right, there is a person who is in possession, lawfully in possession, until they end up not paying rent, and then they just don't allow you to have certain legal processes. Well, I think, though, that it's a distinction without a difference, your honor. I think that once the lease is terminated, like, or once they're in violation of the lease, they're not in legal possession of the property any longer. Their leasehold is terminated. They're in legal possession until they have been evicted. Right. Lawfully. I understand, your honor. But it was the government action that prevented that from happening. And in looking at, in particular, the language of the recent Supreme Court case from the Alabama Association of Realtors, when they go, that is a commercial real estate case. Didn't that really just rely on the lack of government power, period? Was it what kind of thing they were doing, or how well they were doing it? It was they didn't have the authority to act in that area. I'm sorry to interrupt the court. I think the importance is the language that six members of the Supreme Court went out and said. And that is the fact that the inference, reading the Cedar Point case and the Alabama case together, is that the right to exclude is an essential covenant within the interest of owning private property. But these tenants were not excluded. They were allowed to have this space contractually. Well, they were not excluded because the government prevented my client from excluding them. That's a different thing. I'm sorry. No, I just was going to ask, why isn't this permitted under the court's decision in Yee, where the court held that a rent control regulation is not the kind of taking that you're talking about? This seems like the same thing. It's an accommodation of a tenant. It's the landlord invited onto the property. Well, I think that, and we cite this in our reply brief, Your Honor, directly as it relates to language from Yee. Yee says, at the face of the regulatory scheme, neither the city nor the state compels the petitioner, once they have rented their property, to continue to do so. So even in Yee, which dealt with a rent control type situation, Yee doesn't preclude this right to exclude. And it also, Yee, the language of the court in Yee specifically states at page 527 to 528, is there's nothing in their holding that requires the commercial property owner to continue to rent. In this case, by any measure, the government precluded my client from actively excluding people who exceeded. They delayed an exclusion. But that is, again, the Supreme Court cases talk about that. That's distinction without a difference, Your Honor. That here, it's so crucial, and I understand the court's concern that the court initially brought up regarding COVID. I understand that. I think we all recognize the significance of that pandemic. But in this case, these are commercial leases, and all the government action did was transfer the burden from one business owner to another. And that's not effectuating the type of government interest that the Jacobson's cases seek to... You're down to one minute and 17 seconds. You want to save it for rebuttal? Yes, Your Honor. Before you come back, counsel, I would like for you to discuss the standing issue, please. Start of the what, Your Honor? Standing. Yes, Your Honor. Good morning, Your Honors. May it please the court. Elizabeth Atkins on behalf of defendant appellee, Mayor Todd Gloria. Your Honors, there may one day be a case to cause this court to overturn decades of taking jurisprudence. However, this is not that case. The appellant uses hypothetical and academic arguments to sway the court, but the facts of this case keep it squarely within ye and its progeny. Accordingly, the mayor respectfully request this court to affirm the lower court's finding that the moratorium did not affect a per se taking, and as recently confirmed by this court in the unpublished opinion, El Papal versus City of Seattle. Counsel, you know unpublished opinions are not precedent. Correct, Your Honor. But given the emergency and unique situations of COVID-19, they could be persuasive on the court. Moreover, this court should affirm that appellant lacks standing to bring this case and that the Contracts Clause claim is now moot. Moving to that last point, first, Your Honors, there's no standing under the Contracts Clause claim because there's no longer a live controversy under Article 3. As you pointed out, Justice Boggs, as recently explained... Judge. I'm so sorry, Judge Boggs. As recently explained by this court in Jevons v. Inslee, a claim which seeks only declaratory and injunctive relief for potential past violation would amount to an impermissible advisory opinion. Here, the appellant only seeks declaratory and injunctive relief under his Contracts Clause claim, and that's in the record at 3 ER. So if they had sought monetary damages, they might still be alive. That's correct, Your Honor. Like the Melendez case in the Second But again, Your Honor, under the facts of this case, they did not seek monetary damages, and as the moratorium expired on September 30th of 2020, there's no longer an operative law to rule on. Now, while the mayor did not raise this in the briefing below, Article 3 issues such as mootness can be heard by the court at any time and do not need to be discussed in the record below to be heard. Counselor, could you address the immunity of the mayor? The legislative immunity, Your Honor? Yes. Because the mayor was engaged in a legislative act, the legislative immunity immunizes him from any constitutional claims for his participation in that act. In his individual capacity? As we stated in our briefs, Your Honor, the cases don't necessarily specify whether an official capacity. Well, some of them do say that in the official capacity, there is legislative immunity. So by inference, the inference can be drawn that that same immunity does not apply when he is sued in an individual capacity. Do you have a case that says specifically that when an official is sued in his or her official individual capacity, there is legislative immunity? I believe there was a case we cited in our briefs and I don't have it on top of mind. I apologize, Your Honor, where a judge was sued in his in his official capacity and the court granted legislative immunity. Official capacity? Correct, Your Honor. Yeah, so I was asking you for a case where someone was sued in their individual. I'm so sorry, in his individual capacity. Was it? It's not a Ninth Circuit case. It's not a Ninth Circuit case. However, if the court granted legislative immunity, it's not a Ninth Circuit case, it's not a Ninth Circuit case. So I'm sorry, Your Honor, I'm not going to concede that issue. Okay, moving to the takings issue, Your Honor, the appellant seeks to morph this case into Cedar Point. However, this contortion fails because landlord-tenant regulations that fall short of physical occupancy are not physical takings. The Supreme Court ruled in that case that a physical per se taking occurred because the neither the moratorium nor the mayor forced the appellant to become a landlord and rent his property in the first instance. Rather, appellant invited them onto his property when he entered into lease agreements with them. The city did not appropriate access to an unknown or unwanted third party and did not take access from the appellant, nor did the moratorium require the appellant... Let me ask you something about that in terms of, obviously, they partly invited and then Cedar Point. In Cedar Point, if the company had said, fine, you can come and organize between 10 and 12, and the state said, no, no, you've got to allow them to come for six hours a day, would not the Supreme Court probably have come out the same way and said, it's your property, you only let them in for two hours, the state can't make you let them in for eight hours? The Supreme Court might have ruled differently in that case. It might be more like the case at the mall where the property owners were already inviting people onto the public, and so then when they wanted to limit how people were protesting at the mall, it was the use regulation. It was the law regulating the use of the people's land. If in Cedar Point, the landlords had invited organizers onto their land, that might change the characterization of their land from fully private to now you're inviting people from the public onto it. The Supreme Court may have found that to be a use regulation versus a physical, per se, taking. However, here, there was just simply no required acquiescence by appellants to have the tenants on the land, and that's what the Supreme Court has said in FCC versus Florida Power Corp is at the heart of the concept of occupation. In Cedar Point and in these other taking cases, those that entered on the land were an interloper with a government license, and we simply do not have that here. So similarly, if the stores were vacant and the city says you have to let people come in and start selling jewelry, that would be an occupation? It depends, Your Honor, but... The city says, you know, we need business in downtown San Francisco where the stores are vacant, so we order you to allow commercial people to come in and operate. That would be more like a physical, per se, taking because it would require the landowner to have that required acquiescence, and it would be essentially forcing someone onto the land that is an interloper with a government license. Even though the commercial aspect for the landlord might be the same, you've got somebody there not paying any rent. Yes, but in that case, the landowner wouldn't be the one who wished to enter and freely entered into the lease agreement with that. It would be, again, it would be a forced lease agreement or a forced interloper with the government license onto the landowner. Counsel, what's your response to opposing counsel's position that the moratorium for commercial properties was not adequately linked to the pandemic? Your Honor, the duality of the ordinance between residential and commercial tenants is irrelevant here because the collapse of the economy is also a substantial justification under the moratorium. The appellant spoke of public health. However, that is one stated purpose of the moratorium. It's not the only stated purpose of the moratorium, and the moratorium can be found in the record at 2ER163. COVID-19 did have a drastic negative effect on local and global economies, and the moratorium states this from interference with supply chains, reductions in tourism, employee impacts from not being able to work on their health insurance, and their incomes. These goals are expressly stated in the moratorium at 2ER164 and 166. The goals were prevented from impacting the local economy and causing financial instability for those within the city of San Diego, and the moratorium was focused on making sure that individuals had jobs to come back to and a life to come back to once the COVID-19 crisis was over. Appellant cites no authority to state that such an economic goal, a purely economic goal, is an unreasonable one. So are you conceding that it was a purely economic goal for the commercial? No, your honor. It's the commercial moratorium and the residential moratorium were intertwined, and that's why they were put in the same ordinance. It's hard to pull out with COVID-19 to pull out these purposes from each other because they were all parsed together. If individuals lost their businesses, they could no longer pay their residential rents, and they would be evicted. But let me mention or ask you, because those aspects would not have occurred if they had had a different tenant. In other words, if he says, I want to get rid of this tenant and I've got a paying tenant ready to go in, I mean, they didn't plead that, they didn't have it, but wouldn't that undermine the alleged commercial reasons for it? No, your honor, because the harm done to the landlord, it's not just focused on the harm done to the landlords, but the harm done to businesses that were forced to close under mandated state orders. Under my hypothetical, you've got a new business ready to go in, and doesn't that sound a lot more like just helping the guy who happens to be there and hurting the people that want to go in? Potentially, your honor, but I think that the moratorium has to focus on may I finish answering your question? The moratorium at the time had to focus on the issues that were present and the people that were there, and the government can't take into account all hypothetical situations in the middle of an emergency situation. We request the court to affirm. Thank you, your honors. Thank you, counsel. Mr. Buttle. Yes, thank you, your honor. The court initially asked me to address the issue of standing, which we addressed in our opening and our reply brief. I think that, Mr. Bowles, there's two issues primarily that deals with the issue of standing. I think one initially is that Mr. Bowles had virtually sole control of the LLCs involved. Well, did he? He did. Didn't his mother have a 1% interest? But in effect, and he testified in his depositions that he and he alone engaged in the contracts, he operated the LLCs. Well, the LLCs actually were the lessors, correct? They were the lessors, your honor. So they were the parties who actually had standing. Well, I would make the argument that Mr. Bowles actually personally suffered a loss, and so not only did the LLCs have standing, but Mr. Bowles had suffered a loss by not receiving compensation through the rent, so he had standing himself. But I also point out to the court, this case was not decided for over a year, or almost a year by the time we filed our motion for summary judgment and the court ruled. And under what we articulated, there was plenty of time to allow for an amendment, and I would submit the district court abused its discretion not allowing it. Thank you for your time, your honor. I asked you to address standing. I'll give you time to address whatever else you want. Thank you so much for your courtesy, your honor. I just wanted to point out one last point, and that is there is a distinction, and the vast majority of the COVID cases involve the residential moratoriums. And I can understand in light of the emergency situation why the courts have held in that way, but I would submit to this court that the commercial aspect of the case before the court allows for a distinction, and I think the government's interest has not been met, especially with the draconian actions from the government with the moratorium. And one last point, one of the instances involving Mr. Bowles involved an individual who abandoned his property, and Mr. Bowles was not allowed to effectuate the return of the property and utilize it, which the American system of law encourages the sufficient utilization of private property. He wasn't allowed to retake the property because he couldn't file the eviction. So I would argue that the moratorium was overly broad. It didn't satisfy the government interest, and based on the Supreme Court precedent, I think it's clear that this was a regulatory taking, and I would ask the court to find... Did you plead that particular item and, as I asked earlier, plead monetary damages? Obviously, you could make an argument that either an abandoned property could have been re-let to somebody or that there was waste, but I take it you didn't plead that. We pled monetary damages, Your Honor. In the initial complaint, the actual... In the takings context, but not in the contract context? I'm sorry, Your Honor. Correct, Your Honor. I think that it's an issue... It's a factor for the court to consider from a hypothetical perspective in looking at the moratorium itself and the overly broad nature. Look, I understand the government was confronted with a difficult situation, but I think in this case, they overreached. And I think with dealing in the taking aspect, and I'll finish at this point with the court's indulgence, it was Justice Holmes that talked about that when the court looks at a taking, a government action, is that regulation, even if it was in with the best of intentions, did it go too far? And I would submit to this court that within the context of a commercial lease and moratorium, in this case, the City of San Diego, whatever its best intentions, went too far. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court. The next case, California Rental Association v. Newsom, has been submitted on the brief.
judges: Boggs, RAWLINSON, THOMAS